Filed 8/5/13

# IN THE SUPREME COURT OF CALIFORNIA

WESTERN STATES PETROLEUM )
ASSOCIATION, )
                      )
           Plaintiff and Respondent, )
                      )                  S200475
          v. )
                      )       Ct.App. 2/8 B225932
BOARD OF EQUALIZATION, )
                      )        Los Angeles County
          Defendant and Appellant. )    Super. Ct. No. BC403167
_____)

This case presents the issue of how petroleum refinery property should be valued for purposes of taxation. In 1979, in response to the passage of Proposition 13 and related constitutional and statutory enactments, the state Board of Equalization (Board) enacted a rule for assessing the value of most industrial property. (See Cal. Code Regs., tit. 18, § 461.) Under that rule, the value of fixtures, including machinery and equipment, was assessed separately from the value of land and improvements. Petroleum refinery property was assessed in this manner. The separate valuation of fixtures was advantageous to industrial property owners because it allowed them to maximize the tax savings attributable to the depreciation of fixtures.

In 2007, the Board enacted rule 474 (Cal. Code Regs., tit. 18, § 474; hereafter Rule 474) in light of evidence that petroleum refinery property — land, improvements, and fixtures — was generally sold as a unit. Rule 474 provides that the value of such property, unlike most industrial property, must be assessed

1

as a unit.  The Western States Petroleum Association (WSPA) sued to invalidate the regulation.  WSPA contends that Rule 474 is inconsistent with Proposition 13 and related statutory enactments, and is therefore an unlawful exercise of the Board's rulemaking authority.  WSPA also contends that the rule is procedurally invalid because the Board failed to assess the economic impact of the regulation as required by the Administrative Procedures Act (APA) (Gov. Code, § 11346 et seq.).

The trial court and the Court of Appeal held Rule 474 invalid on both grounds.  We conclude that the Court of Appeal erred in finding Rule 474 to be substantively invalid.  As explained below, Rule 474 is consistent with applicable constitutional and statutory provisions, and it is also consistent with the long-standing valuation principle that the proper appraisal unit is the collection of assets that persons in the marketplace normally buy and sell as a single unit.  Thus, the adoption of Rule 474 did not exceed the Board's rulemaking authority.  At the same time, however, we hold that the Board failed to provide an adequate assessment of the rule's economic impact as required by the APA.  Under the APA, the Board was required to make a *reasoned* estimate of all cost impacts of the rule on affected parties.  This the Board did not do.  Accordingly, we affirm the judgment of the Court of Appeal on the ground that Rule 474 is procedurally deficient under the APA.

We note that "[o]rdinarily, when an appellate court concludes that affirmance of the judgment is proper on certain grounds it will rest its decision on those grounds and not consider alternative grounds which may be available. [Citations.]  [¶]  However, appellate courts depart from this general rule in cases where the determination is of great importance to the parties and may serve to avoid future litigation [citations], or where the issue presented is of continuing public interest and is likely to recur.  [Citation.])"  (*Filipino Accountants' Assn. v.*

2

*State Bd. of Accountancy* (1984) 155 Cal.App.3d 1023, 1029–1030; see also *County of Marin v. Superior Court* (1960) 53 Cal.2d 633, 640; 9 Witkin Cal. Procedure (5th ed. 2008) Appeal, § 344, pp. 394–395.)  Here, although the rule's procedural deficiency is a sufficient basis for affirming the Court of Appeal's judgment, our consideration of the substantive ground for invalidating the rule is warranted.  The issue presents a question of law, it has been thoroughly briefed, and it is a matter of considerable importance to the parties and to the public.

## I.

Article XIII, section 1 of the California Constitution declares that "[a]ll property is taxable and shall be assessed at the same percentage of fair market value."  (Cal. Const., art. XIII, § 1, subd. (a).)  Proposition 13, an initiative measure enacted in June 1978, added article XIII A to the California Constitution and changed the taxation of real property by replacing "the fair market valuation standard with that of acquisition value."  (*Roy E. Hanson, Jr. Mfg. v. County of Los Angeles* (1980) 27 Cal.3d 870, 873.)  Article XIII A, section 2 provides that all real property, except for property acquired prior to 1975, shall be assessed and taxed at its value on the date of acquisition, subject to a 2 percent maximum annual inflationary increase.  (*Amador Valley Joint Union High Sch. Dist.* (1978) 22 Cal.3d 208, 235.)  This is sometimes referred to as the indexed or adjusted base year value.  (See Bd. of Equalization, Assessors' Handbook Section 501, Basic Appraisal (2002 rev.) appen. A, Assessment Pre- and Post-Proposition 13, p. 137.)

Proposition 13 did not address how real property should be assessed and taxed when its market value declines instead of appreciates.  To address this issue, California voters passed Proposition 8 in November 1978.  Proposition 8 amended article XIII A so that it now reads:  "The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area

under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction, or other factors causing a decline in value." (Cal. Const., art. XIII A, § 2, subd. (b).) In other words, when the value of real property declines to a level below its adjusted base year value under Proposition 13, the value of the property is determined according to its actual fair market value.

The Legislature formed a task force to study the implementation of the new real property tax system mandated by Proposition 13 and Proposition 8. In January 1979, the task force submitted a report and recommendations to the Assembly Committee on Revenue and Taxation, officially titled Report of the Task Force on Property Tax Administration (hereafter Task Force Report). (See *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal 4th 155, 161.) The Task Force Report has been recognized as a statement of legislative intent for purposes of interpreting the statutes enacted to implement Proposition 13 and Proposition 8. (See, e.g., *Auerbach v. Assessment Appeals Bd. No. 1* (2006) 39 Cal.4th 153, 161.)

The report recommended that "the assessed value of real property be the lesser of the Prop. 13 base value compounded annually by 2% or full cash value. These changes will be measured by that appraisal unit which is commonly bought and sold in the market, or which is normally valued separately." (Task Force Rep., *supra*, at p. 29.) Revenue and Taxation Code section 51 was subsequently amended to incorporate the task force recommendations. (All further statutory references are to the Revenue and Taxation Code unless otherwise specified.) Section 51, subdivision (a) (hereafter section 51(a)) provides that "the taxable value of real property shall . . . be the lesser of: [¶] (1) Its base year value, compounded since the base year by an inflation factor" not to exceed 2 percent per year, or "(2) Its full cash value, as defined in Section 110, as of the lien date, taking into account reductions in value due to damage, destruction, depreciation,

4

obsolescence, removal of property, or other factors causing a decline in value." Section 110, subdivision (a) defines the term "full cash value," synonymously with the term "fair market value," as "the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes."

Most significantly for this case, the term "real property" under section 51, subdivision (d) (hereafter section 51(d)) is defined as "that appraisal unit that persons in the marketplace commonly buy and sell as a unit, or that is normally valued separately." This definition echoes almost verbatim the definition recommended by the Task Force Report. The statute does not further define "appraisal unit," but the term is defined by regulation as "a collection of assets that functions together, and that persons in the marketplace commonly buy and sell as a single unit or that is normally valued in the marketplace separately from other property . . . ." (Cal. Code Regs., tit. 18, § 324.)

In the wake of Proposition 13 and Proposition 8, and shortly before the enactment of section 51, the Board promulgated and then amended rule 461, a regulation applicable to most real property used for manufacturing. (Cal. Code Regs., tit. 18, § 461 (Rule 461).) Rule 461, subdivision (e) (hereafter Rule 461(e)) provides: "Declines in value will be determined by comparing the current lien date full value of the appraisal unit to the indexed base year full value of the same unit for the current lien date. Land and improvements constitute an appraisal unit except when measuring declines in value caused by disaster, in which case land shall constitute a separate unit. For purposes of this subdivision, fixtures and other

5

machinery and equipment classified as improvements constitute a separate appraisal unit."

At the same time that it adopted Rule 461(e)'s classification of fixtures as "a separate appraisal unit," the Board adopted two exceptions to this rule for certain types of industrial property where land and fixtures were valued as a single unit in the marketplace: Rule 468, which applies to oil and gas properties, and Rule 469, which applies to mining properties. (See Cal. Code Regs., tit. 18, §§ 468, subd. (c)(6) (Rule 468), 469, subd. (e)(2)(C) (Rule 469).) Rule 473, adopted in 1995, similarly treats land and fixtures on geothermal properties as a single appraisal unit. (Cal. Code Regs., tit. 18, §473(e)(4)(C) (Rule 473).) Petroleum refinery property was covered by Rule 461(e) until the Board's adoption of Rule 474.

In September 2006, the Board voted three to two to adopt Rule 474 to address "the valuation of the real property, personal property, and fixtures used for the refining of petroleum." (Rule 474, subd. (a).) Subdivision (b)(1) of Rule 474 states that "[t]he unique nature of property used for the refining of petroleum requires the application of specialized appraisal techniques designed to satisfy the requirements of article XIII, section 1, and article XIII A, section 2, of the California Constitution. To this end, petroleum refineries and other real and personal property associated therewith shall be valued pursuant to the principles and procedures set forth in this section." Rule 474, subdivision (c)(2) states that " '[a]ppraisal unit' consists of the real and personal property that persons in the marketplace commonly buy and sell as a unit." Most pertinent here, subdivision (d) states that "[f]or the purposes of this section: [¶] (1) Declines in value of petroleum refining properties will be determined by comparing the current lien date full value of the appraisal unit [i.e., its value in an open market transaction] to the indexed base year full value of the same unit [i.e., its Proposition 13 value].

6

[¶] (2) *The land, improvements, and fixtures and other machinery and equipment classified as improvements for a petroleum refining property are rebuttably presumed to constitute a single appraisal unit . . . .* [¶] (3) In rebutting this presumption, the assessor may consider evidence that: [¶] (A) The land and improvements including fixtures and other machinery and equipment classified as improvements are not under common ownership or control and do not typically transfer in the marketplace as one economic unit; or, [¶] (B) When the fixtures and other machinery and equipment classified as improvements are not functionally and physically integrated with the realty and do not operate together as one economic unit." (Italics added.)

The difference between treating fixtures as a separate appraisal unit (Rule 461(e)) and treating fixtures and land together as a single appraisal unit (Rule 474) may be illustrated by a hypothetical drawn from a Board staff report. (For brevity, we will use the term "land" to refer to land and "non-fixture" improvements considered together unless otherwise indicated.) Suppose that following the purchase of a petroleum refinery property, the assessed value in "Year 1" of the land is $2 million and the assessed value of the fixtures is $1 million. Now suppose the land appreciates at $100,000 per year while the fixtures, when appraised separately, depreciate at $100,000 per year. Under Rule 461(e), the treatment of fixtures as a separate appraisal unit means that the assessed value of the fixtures will decline by $100,000 each year, while the land, though appreciating at $100,000 per year, will yield an assessed value that increases by only 2 percent each year, the maximum increase allowed by Proposition 13. The results are shown in the following table:

|       | Assessed value |             |             |
|-------|----------------|-------------|-------------|
| Year  | Land           | Fixtures    | Total       |
| 1     | $2,000,000     | $1,000,000  | $3,000,000  |
| 2     | $2,040,000     | $900,000    | $2,940,000  |
| 3     | $2,080,800     | $800,000    | $2,880,800  |
| 4     | $2,122,416     | $700,000    | $2,822,416  |
| 5     | $2,164,864     | $600,000    | $2,764,864  |
| 6     | $2,208,162     | $500,000    | $2,708,162  |

By contrast, if land and fixtures were treated as a single appraisal unit under Rule 474, the total assessed value of petroleum refinery property beyond Year 1 would be greater than the values shown above. When such property is treated as a single unit, fixture depreciation ($100,000 per year) may be offset by the full amount of land appreciation ($100,000 per year), resulting in a total assessed value of $3 million each year. The total assessed value may be even greater than $3 million beyond Year 1 (though no greater than a 2 percent annual increase) to the extent that fixture values decline by less than $100,000 per year when petroleum refinery fixtures are bought and sold in the open market as a single unit with the underlying land. Thus, owners of petroleum refinery property pay higher property taxes under Rule 474 than under Rule 461(e).

Before adopting Rule 474, the Board held a hearing at which several public officials testified in favor of the rule. Typical was the testimony of Rick Auerbach, the Los Angeles County Assessor, who stated that in his experience "refineries in California . . . are bought and sold as a unit. . . . I am not aware of one that has not been sold as a unit. If we have a case where there is the potential for a refinery to be dismantled and sold — where the fixtures are sold separately,

8

the proposed rule is a rebuttable presumption and we would take that into account. And we would value the fixtures separately."

The Board concluded in its final statement of reasons before adopting the rule that "sufficient evidence in the rulemaking record exists to determine that proposed Rule 474 is necessary to obtain assessments more accurately reflecting how petroleum refinery properties would actually trade in the marketplace. . . . At the June 27, 2006 Property Tax Committee meeting, Thomas Parker, Deputy County Counsel, Sacramento County; Rick Auerbach, Los Angeles County Assessor and President of the California Assessor's Association; Lance Howser, Chief Assessor, Solano County; and Robert Quon, Director of Major Appraisals for the Los Angeles County Assessor's office, all testified that refineries are in fact bought, sold, and valued as a single unit. In the same meeting, Mr. Auerbach testified that refineries are different from other heavily-fixtured manufacturing industries such as breweries, canneries, and amusement parks and toy manufacturing. Refineries are unique in that up to 80 percent of their values are contained in the fixtures and because the land and fixtures are so integrated, it is difficult to physically separate the fixtures from the land. Further, the land and fixtures are also so economically integrated that a buyer normally would not, in a fair market transaction, purchase the land separately from the fixtures or the fixtures separately from the land. [¶] Since petroleum refineries are bought and sold as a unit consisting of land and fixtures, to value the fixtures separate and apart from the land may result in assessed values either below or above fair market value in violation of Propositions 8 and 13."

Petroleum industry counsel submitted evidence to the Board, mostly in the form of for-sale advertisements and newspaper articles, showing that refinery fixtures are sometimes dismantled and sold separately.

9

In November 2007, the Office of Administrative Law approved the regulation, and it became effective in December 2007. In December 2008, WSPA filed a complaint challenging Rule 474's validity, alleging four causes of action and seeking a declaration that (1) the Board violated the APA because Rule 474 is inconsistent with California Constitution article XIII A and section 51(d), and not necessary to implement such law; (2) Rule 474 violates article XIII A's cap on year-to-year increases in assessed value of real property; (3) Rule 474 violates article XIII A's requirement of a two-thirds vote of the Legislature for raising real property taxes; and (4) Rule 474 violates petroleum refiners' constitutional right to equal protection and uniformity of laws.

In October 2009, the Board and WSPA filed cross-motions for summary judgment. WSPA argued that Rule 474 violates section 51(d) and California Constitution article XIII A, and that the Board failed to provide an adequate statement of economic impact as required by the APA. The trial court granted WSPA's summary judgment motion on both grounds, and the Court of Appeal affirmed on both grounds. We granted review.

## II.

We first address the standard of review. Government Code section 15606, subdivision (c) authorizes the Board to "[p]rescribe rules and regulations to govern local boards of equalization when equalizing, and assessors when assessing . . . ." Further, the Board is empowered to "[p]repare and issue instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation." (*Id.*, subd. (e).) Such rules "shall include, but are not limited to, rules, regulations, instructions, and forms relating to classifications of kinds of property and evaluation procedures." (*Id*., subd. (f).) As these provisions indicate, the orderly functioning of our property tax system depends on administrative regulations to

10

implement general statutory directives. The precise content of such regulations is neither mandated nor prohibited by statute and may depend on the application of statutory principles to particular factual situations. Rule 474 is one such regulation arising from the Board's exercise of its quasi-legislative power to issue generally applicable and legally enforceable regulations pursuant to statutory authorization. (See *American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 460 (*American Coatings*).)

As discussed below, the Board in promulgating Rule 474 was required not only to interpret the relevant statute but also to evaluate whether the evidence presented to it was sufficient to warrant a special rule governing petroleum refinery property. The latter task involves the exercise of the Board's discretion. Justice Kennard contends that Rule 474 was an interpretive and not a quasi-legislative regulation, citing *Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 309–310 (*Carmona*). (See conc. and dis. opn. by Kennard, J, *post*, at pp. 8–9.) But *Carmona* is distinguishable because the agency there "viewed the question before it as a matter involving the interpretation and application of an existing regulation" and therefore was not making "a quasi-legislative judgment declining to promulgate a new regulation." (*Carmona*, at p. 310.) In issuing Rule 474, the Board has clearly promulgated a new regulation applying to a specific class of property and, in so doing, has made a quasi-legislative judgment based on its evaluation of the evidence as well as its understanding of the statute.

As our precedent has stated, "quasi-legislative rules . . . represent[] an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. [Citations.] Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question

11

lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10–11 (*Yamaha*); see Gov. Code, § 11342.2 [implementing regulations adopted pursuant to statutory authorization must be "consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute."].)  When a regulation is challenged on the ground that it is not "reasonably necessary to effectuate the purpose of the statute," our inquiry is confined to whether the rule is arbitrary, capricious, or without rational basis (*Yamaha*, *supra*, 19 Cal.4th at p. 11 & fn. 4) and whether substantial evidence supports the agency's determination that the rule is reasonably necessary (Gov. Code, § 11350, subd. (b)(1)).

At the same time, when an implementing regulation is challenged on the ground that it is "in conflict with the statute" (Gov. Code, § 11342.2) or does not "lay within the lawmaking authority delegated by the Legislature" (*Yamaha*, *supra*, 19 Cal.4th at p. 10), the issue of statutory construction is a question of law on which a court exercises independent judgment.  (See *American Coatings*, *supra*, 54 Cal.4th at p. 460.)  In determining whether an agency has incorrectly interpreted the statute it purports to implement, a court gives weight to the agency's construction.  (See *id.* at p. 461 ["How much weight . . . is 'situational,' and greater weight may be appropriate when an agency has a ' "comparative interpretive advantage over the courts," ' as when ' "the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion." ' [Citation.]"].)  "Nevertheless, the proper interpretation of a statute is ultimately the court's responsibility." (*Id.* at p. 462.)

### III.

Although WSPA contends that Rule 474 is arbitrary and unsupported by substantial evidence, its principal argument is that Rule 474 violates various

12

statutory and constitutional provisions.  Notably, WSPA does not challenge Rule 474 on the ground that its factual premise — that petroleum refinery land and fixtures are *usually* sold together — is somehow infirm.  During the public comment process, petroleum industry representatives submitted materials showing that refinery fixtures are, on occasion, sold separately from the land.  Consistent with these materials, Rule 474 expressly acknowledges the possibility that refinery land and fixtures are not invariably sold as a unit:  subdivision (d)(2) establishes a rebuttable presumption that refinery land and fixtures constitute a single appraisal unit, and subdivision (d)(3) describes the types of evidence that may rebut the presumption.  Moreover, WSPA does not contend that it is burdensome to rebut the presumption in situations where refinery land and fixtures are not sold, controlled, or operated as a single unit.  WSPA's position is that even if refinery land and fixtures are generally sold as a single unit, the Board is statutorily and constitutionally prohibited from appraising such land and fixtures as a single unit. We apply independent judgment in resolving the issues of statutory and constitutional interpretation before us.

**A.**

As noted, the constitutional mandate governing our real property tax system before Proposition 13 was that such property "shall be assessed at the same percentage of fair market value."  (Cal. Const., art. XIII, § 1.)  After the passage of Proposition 13 and Proposition 8, the California Constitution now provides:  "The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction, or other factors causing a decline in value."  (Cal. Const., art. XIII A, § 2, subd. (b).)  So, while there is a cap on the assessed value of property when its fair market value has appreciated, the assessed

13

value of property remains its fair market value when that value has fallen. (See *State Bd. of Equalization v. Board of Supervisors* (1980) 105 Cal.App.3d 813, 822–823 [Board rule enacted after Proposition 13 but before Proposition 8 disallowing "actual market value depreciation" is inconsistent with article XIII, section 1].) Rule 474's market-based approach to determining the proper appraisal unit for petroleum refinery property ensures that reductions in property values are measured according to fair market value. Thus, Rule 474 appears consistent with articles XIII and XIII A.

Rule 474 is also consistent with section 51(d). As noted, section 51(d) states: "For purposes of this section, 'real property' means that appraisal unit that persons in the marketplace commonly buy and sell as a unit, or that is normally valued separately." By its terms, the statute provides two alternative methods of determining the appraisal unit that constitutes taxable real property: it is either (1) a unit "that persons in the marketplace commonly buy and sell as a unit" or (2) a unit "that is normally valued separately." Rule 474 applies the first method to petroleum refinery property.

The Court of Appeal rejected this straightforward reading of section 51(d). Relying on legislative history, it opined that "the Legislature, in enacting the section, did not intend to approve the use of two, alternative and disjunctive definitions of appraisal units of real property at the sole discretion of [the Board]. Instead, the Legislature was acknowledging that the then-existing valuation formulas contemplated valuing land and improvements as an appraisal unit, and valuing fixtures as a separate appraisal unit to allow for depreciation, and it intended that these valuation formulas would carry forward under Prop. 13 and Prop. 8, particularly in the absence of evidence of any change in circumstances justifying a change in valuation formulas. Giving such a meaning to section 51(d) makes sense when its historical context is remembered. In its effort to implement

14

Prop. 13 and Prop. 8 in accord with the voters' intent, the Legislature reasonably concluded that it was important that the valuation formulas existing before the voters spoke would remain the same under the new tax system established by the voters.  In short, the voters' conception of 'real property' as it was defined and valued would remain the same under the new real property tax system as it was under the prior real property tax system in order to assure that the restrictions imposed on real property taxes would actually result in realized restrictions on real property taxes.  The Legislature well reasoned that, if the manner in which real property was understood and valued did not remain constant in the transition from the prior real property tax system to the new real property tax system, then the voters' intended goal of restricting real property taxes might prove elusive.  [The Board's] interpretation of section 51(d) essentially discards the statute's intent to fix in place the pre-Prop. 13 and Prop. 8 valuation formulas for real property.  Instead, [the Board] would interpret section 51(d) to allow for the adoption of new valuation formulas by which the framework governing real property could be manipulated to avoid the restrictions on real property taxes imposed by the voters when they approved Prop. 13 and Prop. 8."

There is no dispute that section 51(d)'s definition of a taxable "appraisal unit" was intended to promote continuity in valuation practices before and after the passage of Proposition 13 and Proposition 8.  The Task Force Report, which recommended the two alternative concepts of an appraisal unit codified in section 51(d), explained that "the purpose of Prop. 13 was to place a cap on the value of property in any one year, while Prop. 8 sought to allow values to rise and fall to any point <u>below</u> this cap, should <u>actual</u> market values so dictate.  [¶] The purpose of the 'appraisal unit' concept is to ensure that these increases or declines in value be measured *in the same manner as such property was appraised prior to Prop. 13*."  (Task Force Rep., *supra*, at p. 31, italics added.)

15

What is disputed is how real property was appraised prior to Proposition 13. WSPA and the Court of Appeal contend that in the case of industrial property, land and fixtures have historically been appraised separately and that section 51(d)'s "normally valued separately" language was intended to codify this practice. According to the Court of Appeal, "assessors for many years leading up to the late 1970's assessed the value of land and improvements as one appraisal unit, and assessed the value of fixtures as a separate appraisal unit in order to account for depreciation. And, it appears from the appellate record that while the owner of a manufacturing or industrial property may have received a single real property tax bill each year, the bill would have been the reflection of an assessed value for land and improvements, and an assessed value for fixtures. The total assessed value of the real property would then be computed by adding the two distinct appraisal units, with the ad valorem real property tax then imposed on the total assessed value. As a result of the practice of applying these separate appraisal units valuation formulas, the value of the fixture-related appraisal unit of an industrial or manufacturing property would, in the absence of the addition of new fixtures, decline each year to reflect depreciation. This means that the amount of real property taxes attributable to fixtures would also decline."

The Court of Appeal, however, appears to have confused assessment with valuation. Constitutional and statutory provisions have long required land and improvements to be assessed separately, with improvements in this context including fixtures. (Cal. Const., art. XIII, § 13; §§ 105, 602, 607.) This principle was explained in *Mahoney v. City of San Diego* (1926) 198 Cal. 388, where an assessor arbitrarily valued improvements separately from land and thereby systematically undervalued the improvements, apparently to encourage development. This court recognized that in order to comply with constitutional and statutory requirements that "improved and unimproved real estate shall have a

16

uniform basis of valuation, it was essential that the valuations to be placed upon land and upon the improvements thereon, whether in the form of buildings or crops or trees, should be separately set forth in the making of assessments thereon." (*Id.* at p. 399.) But we made clear that the constitutional and statutory provisions requiring separate assessments "do not refer to the *valuations* to be placed upon these two classes of taxable property, but merely to the fact that the valuations thereof fixed by the assessor in conformity with the other provisions of the constitution and statutes relating to the basis of the assessment of property values shall be *separately stated* by him in his assessment-books." (*Ibid.*, italics added.) We thus rejected the assessor's interpretation of the relevant constitutional and statutory provisions to mean that he was required to appraise improvements as if they were "physical[ly] separat[ed] from the real estate upon which [they] stood." (*Ibid.*)

Thus, the fact that separate *assessments* for land and fixtures appear on a property tax bill is not evidence of separate *appraisal* of those components of real property. The requirement of separate assessments was never intended to supplant the market-based approach to determining the proper appraisal unit, and this distinction has long been recognized in practice. (See Bd. of Equalization, Assessors Handbook, Appraisal of Urban Real Estate (2d ed. 1958) Appraisal Process, p. 5 (1958 Assessors Handbook) ["Valuation of improved property as a unit does not conflict with provisions of State law requiring values of land and improvements to be separately entered on the assessment roll. The legal provisions do not require the separate appraisal of land and improvements but merely that the valuations of each shall be separately stated on the assessment roll."]; Bd. of Equalization, Assessors' Handbook, General Appraisal Manual (1966) Economics of Value, p. 16 (1966 Assessors' Handbook) ["For purposes of assessment, the law requires a separate assessment of land, improvements, and

17

personal property. But statutes do not require separate <u>appraisals</u> of these different classes of property."]; Bd. of Equalization, Assessors' Handbook, General Appraisal Manual (1975) Market Value Concept, p. 13 (1975 Assessors' Handbook) [same].)

As the Task Force Report indicates, the Legislature enacted section 51(d) on the understanding that real property values may "rise and fall . . . [to] any point <u>below</u> [the Proposition 13] cap, should <u>actual</u> market values so dictate." (Task Force Rep., *supra*, at p. 31.) Rule 474 furthers the long-standing mandate to appraise real property according to "actual market values," and the evidence in the record shows that Rule 474's market-based approach to determining the proper appraisal unit was in fact the traditional method for making such determinations before Proposition 13. The 1966 Assessors' Handbook makes this clear: "It is obvious that market value necessarily involves a unit as well as a price. Consequently, no discussion of market value is complete unless there is some analysis of the unit to be valued. It seems to be clear that, since the objective is market value, the proper unit to be valued is a unit that is dealt in by the market, i.e., one that people buy and sell. Any fraction of this unit involves artificiality." (1966 Assessors' Handbook, *supra*, at pp. 15–16.) The 1975 Assessors Handbook similarly states: "Since the appraisal objective is to estimate market value, the proper unit to be valued is the unit that people in the market buy and sell." (1975 Assessors' Handbook, *supra*, at p. 12.) If "[t]he unit typically dealt in by the market is the combination of land and building," then "the combination is the logical appraisal unit from an economic point of view." (*Ibid.*; see also 1958 Assessors Handbook, *supra*, at p. 5 ["It is well recognized that the sum of the value estimates of fractional parts of a property is not necessarily equal to the value of the whole, and that values of land and improvements are not independent of each other. It follows, therefore, that improved realty must be valued as a

unit."].)  Thus, Rule 474 is fully consistent with the Legislature's objective "to ensure that . . . declines in value [are] measured in the same manner as such property was appraised prior to Prop. 13."  (Task Force Rep., *supra*, at p. 31.) Before and after Proposition 13, *actual market value* has guided the appraisal of real property in the declining value context.

WSPA notes that Rule 461(e), promulgated just before the enactment of section 51(d), "has expressly segregated land and fixtures for decline-in-value purposes since 1979" and contends that "the Board has historically interpreted [section 51(d)'s] 'normally valued separately' language as codifying Rule 461(e)." But contemporaneous with its adoption of Rule 461(e), the Board also adopted Rule 468 (oil and gas properties) and Rule 469 (mining properties), which treat land and fixtures as a single appraisal unit based on marketplace realities.  Further, in 1995, the Board adopted Rule 473, which similarly treats land and fixtures on geothermal properties as a single appraisal unit.  Thus, the Board has not interpreted section 51(d) to codify a rule that fixtures must always be treated as a separate appraisal unit in the declining value context or that the treatment of land and fixtures as a single unit is limited only to the exceptions that existed when section 51(d) was enacted.

WSPA cites no other evidence that section 51(d) was intended to codify Rule 461(e), and we are aware of none.  It is true that section 51(d)'s alternative conceptions of "appraisal unit" — what "persons in the marketplace commonly buy and sell as a unit" and what "is normally valued separately" — indicate that the Board has leeway to define an appraisal unit by reference to customary appraisal practices when, for example, there is little market information about how a particular type of property is bought or sold.  But there is no indication that the Legislature intended the Board to be forever bound by the conception of "appraisal unit" it formulated in 1979, even when the Board later has substantial evidence

19

that separate appraisal of land and fixtures does not reflect how a particular type of property is traded in the marketplace. To the extent that Rule 461(e) informs the meaning of section 51(d), it was undisputed during this rulemaking that Rule 461(e) itself, consistent with historic appraisal practices, reflected a marketplace judgment that land and fixtures for industrial property are typically bought and sold separately, and therefore should be appraised separately. In adopting a different method for appraising petroleum refinery property on the ground that such property is typically bought and sold as a single unit, the Board followed, rather than departed from, the marketplace approach underlying Rule 461(e) as well as Rules 468, 469, and 473. Although WSPA contends that petroleum refinery property more closely resembles properties covered by Rule 461(e) than properties covered by Rules 468, 469, or 473, there is substantial evidence in the record that land and fixtures on petroleum refinery property are uniquely integrated, that fixtures represent an unusually high proportion of the value of such property, and that petroleum refinery land and fixtures are usually sold as a single unit. (See *ante*, at pp. 8–9.)

Rule 474 thus represents no change in the method of determining the appropriate appraisal unit. In adopting this exception to Rule 461(e) for petroleum refinery property, the Board sought to align the concept of "appraisal unit" with the settled rule that when real property declines in value, it should be appraised according to its actual market value. There is no evidence that section 51(d) was intended to freeze or codify the treatment of industrial fixtures as a separate appraisal unit. Rule 474 comports with section 51(d), which defines taxable "real property" in one of its formulations as "that appraisal unit that persons in the marketplace commonly buy and sell as a unit."

Finally, WSPA contends there are other types of industrial property that are similarly integrated with the land and have a comparably high proportion of

20

property value derived from fixtures. To prevail against this argument, the Board need only establish that Rule 474 is not arbitrary, capricious, or without a rational basis. (See *Yamaha*, *supra*, 19 Cal.4th at pp. 10–11.) Under this standard, the Board need not extend the rule to all other comparable types of industrial property or show that petroleum refinery property is entirely unique. (See *U.S. Cellular Corp. v. F.C.C.* (D.C. Cir. 2001) 254 F.3d 78, 86 [Regulatory "agencies need not address all problems 'in one fell swoop,' [citations][.] 'Reform may take place one step at a time, addressing itself to the phase of the problem which seems most acute to the [regulatory] mind.[]' "].) It is enough that the Board has reached a rational conclusion, based on substantial evidence, that petroleum refinery property is sufficiently different from most industrial property to warrant appraisal of land and fixtures as a single unit. (See *ante*, at pp. 8–9.)

**B.**

Apart from its contention that Rule 474 is inconsistent with section 51(d), WSPA argues that Rule 474 has the effect of taxing unrealized increases in land value in violation of Proposition 13: "Proposition 13 allows the reassessment of land, in whole or in part, under only three circumstances: a change in ownership, new construction, and a capped inflation adjustment. Rule 474, however, allows unrealized increases in land and improvements value, not assessable under Prop. 13, to offset actual declines in fixture value resulting from depreciation even if none of the three exceptions occur. In so doing, Rule 474 violates a central tenet of Prop. 13 . . . by allowing land value in excess of the base-year value cap on land to be assessed."

This argument fails, however, because Proposition 13 does not specifically cap the taxable value of land or improvements per se. Instead, Proposition 13 caps growth in "the appraised value of *real property*" (Cal. Const., art. XIII A, § 2, subd. (a), italics added), which in this context encompasses land, improvements,

21

and fixtures (§§ 104, 105). To say that Rule 474 violates Proposition 13 by allowing taxation of unrealized land value above the Proposition 13 cap is to assume that land, by itself, must be treated as a separate appraisal unit for purposes of real property taxation. But, as explained above, no constitutional or statutory provision precludes the Board from treating land and fixtures as a single appraisal unit when substantial evidence indicates that a particular type of property is bought and sold as a single unit in the marketplace.

Further, WSPA contends that Rule 474 violates the Legislature's mandate, enacted pursuant to Proposition 13, that the "full cash value" of real property "tak[e] into account reductions in value due to . . . depreciation . . . ." (§ 51(a)(2).) According to WSPA, because the fair market value of petroleum refinery property considered as a single unit masks the value of fixture depreciation considered by itself, Rule 474's treatment of land and fixtures as a single appraisal unit violates the requirement to account for depreciation in determining full cash value.

However, Rule 474 does "tak[e] into account reductions in value due to . . . depreciation" in determining the "full cash value" of petroleum refinery property. (§ 51(a)(2).) Section 51(a)(2) refers to "full cash value, as defined in Section 110," and section 110 defines "full cash value" (and, synonymously, "full market value") to mean, with exceptions not relevant here, "the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes." By focusing on the value of property "if exposed for sale in the open market" in a fair and transparent transaction, the definition of "full cash value" contemplates that

22

appraisal of real property will reflect the economic reality of how a particular type of property is actually bought and sold.

For property whose fixtures are typically sold separately in the open market, fixtures are properly treated as a separate appraisal unit, and fixture depreciation may be independently recognized. But when land and fixtures are typically sold as a single unit, they are properly treated as a single appraisal unit, even if fixture depreciation is offset by land appreciation or otherwise reduced by valuing land and fixtures together. Indeed, consistent with the emphasis on marketplace realities in the Assessors' Handbooks cited earlier (see *ante*, at pp. 17–18), we recognized in *Mahoney* that "in common knowledge and experience," the actual market value of improvements is often "dependent upon the location" and cannot accurately be determined by separating improvements from the underlying land. (*Mahoney*, *supra*, 198 Cal. at pp. 401–402.) To account for fixture depreciation separately when land and fixtures are actually bought and sold as a single unit would allow the owner to claim a reduction in real property value that is economically fictitious, resulting in a tax windfall. Neither California Constitution article XIII A nor section 51 nor traditional appraisal practices require the unit of appraisal to be defined in a manner that maximizes the depreciation of fixtures in contravention of economic reality. To the contrary, the law and consistent practice have long required appraisal of real property in the declining value context to reflect its "full cash value" — that is, the value "property would bring if exposed for sale in the open market." (§§ 51(a)(2), 110.) Rule 474 is consistent with this principle.

## C.

WSPA also contends that Rule 474 violates the constitutional prohibition on tax increases without a two-thirds vote of the each house of the Legislature. California Constitution article XIII A, section 3, subdivision (a) (hereafter article

XIII A section 3(a)) provides: "Any change in state statute which results in any taxpayer paying a higher tax must be imposed by an act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed." WSPA argues that because the adoption of Rule 474 results in a higher tax bill for at least some petroleum refinery owners, it violates the two-thirds voting requirement.

By its terms, article XIII A section 3(a) applies only to a "change in *state statute* which results in any taxpayer paying a higher tax." (Italics added.) It does not apply to an agency's decision to modify an administrative rule in response to substantial evidence that such modification is reasonably necessary to faithfully implement an existing statute. The Court of Appeal's decision in *River Garden Retirement Home v. Franchise Tax Bd.* (2010) 186 Cal.App.4th 922 is instructive. There, the taxpayer argued that the Franchise Tax Board enacted a tax increase within the meaning of article XIII A, section 3(a) when it adopted a policy of disallowing certain dividend deductions so as to conform to statutory and case law. Rejecting this argument, the court said: "Section 3 . . . by its terms and according to the overall aim of the initiative applies only to revenue increasing enactments. The FTB is charged with administering and enforcing our franchise and income tax laws. It *does not* have taxing powers. . . . . It did not 'enact' anything within the meaning of article XIII A, section 3." (*Id.* at pp. 949–950.)

The Board here is similarly charged with administering and enforcing the state's property tax laws and has no taxing power. Article XIII A, section 3(a) does not prevent the Board from exercising its statutorily delegated authority to promote uniform assessment practices by revising its own rules regarding appraisal units to more closely reflect the actual market value of real property. The Board has no power to determine tax rates or to extend the scope of a tax to

24

items previously untaxed. (Cf. *AB Cellular LA, LLC v. City of Los Angeles* (2007) 150 Cal.App.4th 747, 760–761 [extension of cell phone tax to usage previously untaxed is a tax increase requiring voter approval].) The Board's power pursuant to Government Code section 15606 is limited to prescribing methods of assessing property and related matters in order to implement the tax statutes; these are well-recognized administrative functions. (See *Hahn v. State Bd. of Equalization* (1999) 73 Cal.App.4th 985, 997.) In sum, the Board's modification of its own post-Proposition 13 rules to more accurately appraise a class of property is not a tax increase resulting from a "change in state statute" under article XIII A, section 3(a).

## III.

In addition to challenging Rule 474's substantive validity, WSPA contends that the adoption of the rule was procedurally deficient because the Board failed to adequately assess the economic impact of the regulation as required by the APA. In addressing this issue, we begin with a brief review of the APA.

## A.

"The APA is intended to advance 'meaningful public participation in the adoption of administrative regulations by state agencies' and create 'an administrative record assuring effective judicial review.' [Citation.] In order to carry out these dual objectives, the APA (1) establishes 'basic minimum procedural requirements for the adoption, amendment or repeal of administrative regulations' (Gov. Code, § 11346) which give 'interested parties an opportunity to present statements and arguments at the time and place specified in the notice and calls upon the agency to consider all relevant matter presented to it,' and (2) 'provides that any interested person may obtain a judicial declaration as to the validity of any regulation by bringing an action for declaratory relief in the superior court.' [Citation.] The APA was born out of the Legislature's perception

25

there existed too many regulations imposing greater than necessary burdens on the state and particularly upon small businesses." (*Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 908–909.)

To effectuate these goals, the APA provides that every agency subject to the APA that proposes to adopt, amend, or repeal a regulation is required to submit a notice of the proposed action to the Office of Administrative Law for review, and to make the notice available to the public upon request. (Gov. Code, §§ 11346.2, 11346.5, subd. (a).) The notice must contain "a copy of the express terms of the proposed regulation" as well as "an initial statement of reasons for proposing the adoption, amendment, or repeal of a regulation." (*Id.*, § 11346.2, subds. (a), (b).) This initial statement of reasons must include "[a] statement of the specific purpose of each adoption, amendment, or repeal" and "[a] description of reasonable alternatives to the regulation and the agency's reasons for rejecting those alternatives." (*Id.*, § 11346.2, subd. (b)(1), (5)(A).) The initial statement of reasons also must include "[f]acts, evidence, documents, testimony, or other evidence on which the agency relies to support an initial determination that the action will not have a significant adverse economic impact on businesses." (*Id.*, § 11346.2, subd. (b)(6)(A).) We examine the economic impact assessment requirement in detail below.

The notice of proposed action is followed by a public comment period. Under Government Code section 11346.8, the agency may hold a public hearing at which "both oral and written statements, arguments, or contentions, shall be permitted. . . . If a public hearing is not scheduled, the state agency shall . . . afford any interested person or his or her duly authorized representative, the opportunity to present statements, arguments or contentions in writing." Government Code section 11346.5, subdivision (a)(15) provides that the notice of proposed action must specify "[t]he date by which comments submitted in writing

26

must be received to present statements, arguments, or contentions in writing relating to the proposed action in order for them to be considered by the state agency before it adopts, amends, or repeals a regulation." "In addition, a public hearing shall be held if, no later than 15 days prior to the close of the written comment period, an interested person or his or her duly authorized representative submits in writing to the state agency, a request to hold a public hearing." (Gov. Code, § 11346.8, subd. (a).)

After the public comment period, if the agency decides to enact the regulation, it must prepare a "final statement of reasons" for adopting the proposed rule, which must include "[a]n update of the information contained in the initial statement of reasons." (Gov. Code, § 11346.9, subd. (a)(1).) "If the update identifies any data or any technical, theoretical or empirical study, report, or similar document on which the agency is relying in proposing the adoption, amendment, or repeal of a regulation that was not identified in the initial statement of reasons, or which was otherwise not identified or made available for public review prior to the close of the public comment period," then the agency must make such document available to those participating in the public comment period at least 15 days before adoption of the proposed rule, and the agency must permit and respond to comments regarding that document, pursuant to Government Code section 11347.1. (Gov. Code, § 11346.9, subd. (a)(1).) The final statement of reasons must also include "[a] summary of each objection or recommendation made regarding the specific adoption, amendment, or repeal proposed, together with an explanation of how the proposed action has been changed to accommodate each objection or recommendation, or the reasons for making no change." (Gov. Code, § 11346.9, subd. (a)(3).)

Once the regulation is adopted, "[a]ny interested person may obtain a judicial declaration as to [its] validity . . . by bringing an action for declaratory

relief in the superior court . . . ." (Gov. Code, § 11350, subd. (a).)  "Failure to comply with every procedural facet of the APA, however, does not automatically invalidate a regulation.  A court may declare the regulation invalid only for . . . 'substantial failure' to comply with the act.  (Gov. Code, § 11350, subd. (a).) ' " 'Substantial compliance, as the phrase is used in the decisions, means actual compliance in respect to the substance essential to every reasonable objective of the statute.' . . .  Where there is compliance as to all matters of substance technical deviations are not to be given the stature of noncompliance . . . .  Substance prevails over form." ' "  (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75 Cal.App.4th 1315, 1328.)

**B.**

We turn now to consider whether the Board's economic impact assessment in this case was sufficient to comply with the APA.  Several statutory provisions address an agency's obligation to assess the economic impact of a new regulation.  As noted, an agency's initial statement of reasons for proposing a regulation must include "[f]acts, evidence, documents, testimony, or other evidence on which the agency relies to support an initial determination that the action will not have a significant adverse economic impact on businesses."  (Gov. Code, § 11346.2, subd. (b)(6)(A).)  In addition, Government Code section 11346.5 subdivision (a)(8) provides:  "If a state agency, in adopting, amending, or repealing any administrative regulation, makes an initial determination that the action will not have a significant, statewide adverse economic impact directly affecting business, including the ability of California businesses to compete with businesses in other states, it shall make a declaration to that effect in the notice of proposed action.  In making this declaration, the agency shall provide in the record facts, evidence, documents, testimony, or other evidence upon which the agency relies to support its initial determination.  [¶]  An agency's initial determination and declaration

28

that a proposed adoption, amendment, or repeal of a regulation may have or will not have a significant, adverse impact on businesses, including the ability of California businesses to compete with businesses in other states, shall not be grounds for the office to refuse to publish the notice of proposed action." A regulation may be declared invalid if "[t]he agency declaration pursuant to paragraph (8) of subdivision (a) of Section 11346.5 is in conflict with substantial evidence in the record." (*Id.*, § 11350, subd. (b)(2).)

Further, Government Code section 11346.5, subdivision (a)(9) provides that the notice of proposed action shall include "[a] description of all cost impacts, known to the agency at the time the notice of proposed action is submitted to the office, that a representative private person or business would necessarily incur in reasonable compliance with the proposed action. [¶] If no cost impacts are known to the agency, it shall state the following: [¶] 'The agency is not aware of any cost impacts that a representative private person or business would necessarily incur in reasonable compliance with the proposed action.' " Government Code section 11346.5, subdivision (c) states: "This section shall not be construed in any manner that results in the invalidation of a regulation because of the alleged inadequacy of the notice content or the summary or cost estimates, or the alleged inadequacy or inaccuracy of the housing cost estimates, if there has been substantial compliance with those requirements."

The obligation of agencies to assess the economic impacts of their proposed regulations is also addressed in Government Code, section 11346.3. "State agencies proposing to adopt, amend, or repeal any administrative regulation shall assess the potential for adverse economic impact on California business enterprises and individuals, avoiding the imposition of unnecessary or unreasonable regulations or reporting, recordkeeping, or compliance requirements." (Gov. Code, § 11346.3, subd. (a).) Furthermore, "[t]he proposed

29

adoption, amendment, or repeal of a regulation shall be based on adequate information concerning the need for, and consequences of, proposed governmental action." (*Id.*, § 11346.3, subd. (a)(1).)

The Court of Appeal in *California Assn. of Medicals Product Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286 (*Maxwell-Jolly*) extensively discussed the economic impact assessment required by the APA. There, the court rejected the state agency's argument that in its initial determination of economic impact, it is obliged only to "consider" the proposal's impact and may rely solely on its "beliefs." (*Id.* at p. 305.) "[M]ere speculative belief is not sufficient to support an agency declaration of its initial determination about economic impact . . . ." (*Id.* at pp. 305–306.) Rather, "the agency must provide in the record any ' "facts, evidence, documents, testimony, or other evidence" ' upon which it relies for its initial determination. (Gov. Code, §§ 11346.5, subd. (a)(8), 11347.3, subd. (b)(4).) . . . . An agency specifically must 'assess' the potential adverse economic impact on California business and individuals of a proposed regulation (Gov. Code, § 11346.3) and declare in the notice of proposed action any 'initial determination that the action will not have a significant statewide adverse economic impact directly affecting business.' (Gov. Code, § 11346.5, subd. (a)(8).) These provisions plainly call for an evaluation based on facts." (*Maxwell-Jolly*, at p. 306.)

At the same time, *Maxwell-Jolly* emphasized that "a regulation is not necessarily invalid, even if it has a significant adverse economic impact on business. Government Code section 11346.3 only requires that 'agencies . . . assess the potential for adverse economic impact on California business enterprises and individuals, *avoiding the imposition of unnecessary or unreasonable regulations or reporting, recordkeeping, or compliance requirements*.' (Gov. Code, § 11346.3, subd. (a), italics added.) Thus, regulations

30

*may* have negative economic impacts if necessary or reasonable under the circumstances." (*Maxwell-Jolly*, *supra*, 199 Cal.App.4th at p. 306.)

*Maxwell-Jolly* further explained that "the reference to a 'determination' in Government Code section 11346.5, subdivision (a)(8) states merely that if an agency makes an '*initial* determination that the action will not have a *significant*, statewide adverse economic impact directly affecting business . . . it shall make a declaration to that effect in the notice of proposed action.' (Gov. Code, § 11346.5, subd. (a)(8), italics added.) The qualifying adjective 'initial' indicates the agency's determination need not be conclusive, and the qualifying adjective 'significant' indicates that the agency need not assess or declare *all* adverse economic impact anticipated." (*Maxwell-Jolly*, *supra*, 199 Cal.App.4th at p. 307.)

"Given these factors," the *Maxwell-Jolly* court said, "we conclude the Department's obligation in its initial determination was to make an initial showing that there was some factual basis for the Department's decision. We review the Department's initial determination to determine that the Department has substantially complied with its obligations, and whether it is supported by some substantial evidence." (*Maxwell-Jolly*, *supra*, 199 Cal.App.4th at p. 307.)

We agree with the *Maxwell-Jolly* court's understanding of what the requirement of an initial economic impact assessment entails. The requirement is intended to ensure that such information is provided early in the rulemaking process and then refined based on public comment and further consideration in the later stages. Specifically, an economic impact assessment of a proposed regulation has three phases. First, the agency makes an initial, provisional determination of whether the proposed rule will have a significant adverse economic impact on businesses. Second, during the public comment period, affected parties may comment on the agency's initial determination and supply additional information relevant to the issue. Third, when the agency issues its

31

final decision and statement of reasons, it must respond to the public comments and either change its proposal in response to the comments or explain why it has not.

We also agree with *Maxwell-Jolly* and with the Board that an agency's initial determination of economic impact need not exhaustively examine the subject or involve extensive data collection. The agency is required only to "make an initial showing that there was some factual basis for [its] determination." (*Maxwell-Jolly*, *supra*, 199 Cal.4th at p. 307.) Moreover, inferences and projections that are " 'the product of logic and reason' " may provide a valid basis for an initial determination of economic impact. (*Id.* at p. 308.) And a regulation will not be invalidated simply because of disagreement over the strict accuracy of cost estimates on which the agency relied to support its initial determination. (See Gov. Code, § 11346.5, subd. (c) [regulation may not be invalidated "if there has been substantial compliance with [initial notice] requirements"].)

Even under this deferential standard, however, we agree with WSPA and the courts below that the Board's initial determination that Rule 474 would not have a significant adverse impact on businesses did not substantially comply with the APA. The Board relied on a 2006 document titled "Revenue Estimate" concerning proposed Rule 474. According to the document, which was prepared by Board staff, WSPA reported that there are 20 major refineries located in California, with five in Los Angeles County and four in Contra Costa County. (Bd. of Equalization, Revenue Estimates, Issue No. 6-001 (June 7, 2006) p. 2.) County data indicated that the total assessment in these two counties was over $14 billion, with about 80 percent of that value enrolled as fixtures. Projecting figures statewide, the Board staff estimated that there was $32 billion of refinery property, of which $25 billion consisted of fixtures and $7 billion in land and non-fixture improvements. To "conservatively estimate[]" the incremental amount of taxable

32

assessed value resulting from the proposed rule, the Board staff multiplied the $7 billion in land value by a 2 percent appreciation factor to conclude that Rule 474 would yield "at least $140 million" in additional assessed value. (*Id*. at p. 3.) The Board staff then multiplied $140 million by the 1 percent tax on real property permitted under article XIII A to arrive at $1.4 million as the annual estimated revenue effect of Rule 474, while acknowledging that "[t]he actual revenue effect could be considerably higher or lower depending on the number of properties [affected] and the actual amount of offsetting values." (*Ibid*.) Based on these calculations, the Board concluded that Rule 474 "will not have a significant adverse economic impact on businesses."

The trial court observed that even after extended oral argument, it was "utterly unable to understand why this calculation is correct as a measure of increased taxes from treating refineries as a single assessment unit for decline in value purposes. Even as a theoretical matter, surely there should be some quantification of the effect of depreciation of fixtures on assessed value." The Court of Appeal similarly stated that the Board's analysis failed to provide "an economic impact based on data concerning fixture depreciation on assessed values" and thus "leaves a reader without an understanding of what the taxes on a representative refinery would have been under the formerly applicable Rule 461(e), and what the taxes would be under the new rule Rule 474(d)(2)."

We agree. Even assuming the Board could reasonably project $32 billion as the total value of 20 refineries statewide based on data showing $14 billion as the total value of nine refineries in two counties, the Board's analysis offers no explanation why multiplying $7 billion in land value by a 2 percent appreciation factor is, empirically or conceptually, a valid or reasonable way to estimate the amount of fixture depreciation that would be offset by appraising land and fixtures as a single unit. We cannot discern any theory or facts that would tend to justify

33

this method of estimation, and even the Board's post hoc efforts to explain the estimate in its briefing and at oral argument offer none. Further, as WSPA points out, even if the Board's prediction of future land appreciation were correct, the Board's calculation failed to consider prior land appreciation and the full tax impact that would occur if land were valued at actual market value rather than adjusted base year value.

It is true, as the Board points out, that WSPA did not offer its own independent economic assessment during the comment period. The record shows that WSPA expressed its view that the cost impact of Rule 474 was "greatly understated" and that the cost would be between $5 million and $10 million per year — to which the Board responded that WSPA "has not provided data or methodology from which its cost impact estimates can be independently derived." The Board contends that because its initial economic impact assessment is not "in conflict with substantial evidence in the record" (Gov. Code, § 11350, subd. (b)(2)), there is no basis for invalidating the regulation.

But WSPA's inactivity does not excuse the Board's failure to make a reasoned effort to initially assess the economic impact of Rule 474. Even if the Board's initial determination is not "in conflict with substantial evidence in the record" (Gov. Code, § 11350, subd. (b)(2)), the Board was independently obligated — regardless of what WSPA submitted during the comment period — to "provide in the record facts, evidence, documents, testimony, or other evidence upon which the agency relies to support its initial determination." (Gov. Code, § 11346.5, subd. (a)(8); see *id.*, § 11346.2, subd. (b)(6)(A).) Although we do not understand this requirement to impose a heavy burden on the agency, we cannot deem it satisfied by an opaque calculation unsupported by any facts or other evidence explaining its validity as a reasonable estimate. Were we to hold that an agency's initial determination of economic impact, though unintelligible, may be

34

upheld so long as it does not "conflict with substantial evidence in the record," we would effectively authorize agencies to merely assert the absence of significant adverse economic impact on businesses, without supporting evidence, unless an affected party provided evidence countering the agency's assertion. Although affected parties often may be well-positioned to elucidate the economic impact of a proposed regulation, the APA does not shift the analytical task entirely onto affected parties. Instead, the statutes require the agency to meet an initial, nonconclusive, nonexhaustive evidentiary burden. (*Id.*, §§ 11346.2, subd. (b)(6)(A); 11346.5, subd. (a)(8).) Because we cannot read out of the APA this modest requirement of rationality and transparency, we conclude that the Board did not substantially comply with the APA in its initial determination that Rule 474 would not have a significant adverse economic impact on businesses.

## CONCLUSION

For the reasons above, we hold that Rule 474 is consistent with Proposition 13, Proposition 8, and Revenue and Taxation Code section 51. At the same time, we affirm the judgment of the Court of Appeal invalidating Rule 474 because of the Board's failure to make an adequate initial determination of the rule's economic impact as required by the APA.

LIU, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
MALLANO, J.*
McDONALD, J.**
McKINSTER, J.***

_____

\* Presiding Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

** Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*** Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY KENNARD, J.**


I agree with much of the majority opinion. In particular, I agree that although the rule at issue here (Cal. Code Regs., tit. 18, § 474; hereafter Rule 474), which was adopted by defendant Board of Equalization (Board), does not conflict with any statute or with the state Constitution, it nevertheless is invalid because it was not adopted in compliance with the California Administrative Procedure Act (Gov. Code, § 11340 et seq.; hereafter California APA). But if the Board complies with the California APA and concludes, after compliance, that the rule is warranted, the Board may reissue the same rule.

In deciding that Rule 474 does not conflict with any statute or with the state Constitution, the majority characterizes the rule as a quasi-legislative regulation, subject to the great judicial deference applicable to such regulations. (Maj. opn., *ante*, pp. 11-12.) I disagree. I would hold that the rule simply represents the Board's interpretation of the Legislature's definition of "real property" in Revenue and Taxation Code section 51, subdivision (d) (section 51(d)), and therefore the rule is an interpretive regulation subject to less judicial deference. Nevertheless, because Rule 474 correctly interprets the statute, I agree with the majority that it is substantively valid.

**I**

Plaintiff Western States Petroleum Association sued the Board, arguing, as relevant here, that Rule 474 — which relates to the taxation of petroleum refinery

1

properties — conflicts with Revenue and Taxation Code section 51. That statute describes the method for calculating "the taxable value of real property." (Rev. & Tax. Code, § 51, subd. (a).) "[R]eal property" is "that appraisal unit that persons in the marketplace commonly buy and sell as a unit, or that is normally valued separately." (§ 51(d).) Through Rule 474, the Board applies the statutory definition of "real property" to petroleum refinery property, which is involved here.

The Board issued Rule 474 under its express rulemaking authority over the assessment of property for purposes of taxation. (See Gov. Code, § 15606.) The rule reflects the Board's understanding of how section 51(d) should be applied, as well as the Board's factual findings concerning the market for petroleum refinery property. Under that rule, the value of petroleum refineries, unlike most types of industrial property, must generally be assessed as a single unit that includes *both land and fixtures.* Specifically, "[t]he land, improvements, and fixtures and other machinery and equipment classified as improvements for a petroleum refining property are rebuttably presumed to constitute a single appraisal unit . . . ." (Rule 474.) The Board's rule is significant because of the limits the state Constitution places on the assessed value of land.

For tax purposes, the state Constitution values land at the "base year value" (generally, the market value when last sold), increased by an inflation factor that may not exceed 2 percent per year. (Cal. Const., art. XIII A, § 2.) Rule 474's bundling of land and fixtures affects property owners because land values tend to appreciate over time but fixture values tend to depreciate. For petroleum refinery property, fixtures represent a major portion of the property's overall value. If fixtures are taxed together with land as a single unit, then depreciation in the value of the fixtures is generally offset by appreciation in the value of the land, and thus for tax purposes the overall value of the property remains unchanged. If, however,

2

fixtures are taxed *separately* from land, then the owner will pay lower taxes on the fixtures as their values depreciate over time, and those lower fixture taxes will not be offset by higher land taxes because of the just-described limits imposed by the state Constitution.

Plaintiff challenges the Board's Rule 474 because assessment of a petroleum refinery's land and fixtures as a single unit increases the overall taxes for the owners of such properties.

The majority concludes, as do I, that Rule 474 does not conflict with section 51(d). But in reaching that conclusion, the majority states that Rule 474 is a quasi-legislative regulation, and therefore entitled to great deference on judicial review. (Maj. opn., *ante*, pp. 11-12.) By contrast, I construe the Board's rule as an interpretive regulation, subject to a lesser degree of judicial deference.

## II

An administrative agency's regulations can be of two types: interpretive and quasi-legislative. As explained below, an interpretive regulation defines or clarifies an ambiguous term or phrase in a statute, whereas a quasi-legislative regulation is issued under a delegation of legislative power to fill a substantive gap left open in a statute. The measure of whether a regulation is quasi-legislative is whether it makes *a new legal standard where none previously existed*. The regulation is interpretive if applicable statutory law creates an enforceable standard irrespective of the regulation.

The differences between the two types of regulations were described in detail by this court 13 years ago: "It is a 'black letter' proposition that there are two categories of administrative rules and that the distinction between them derives from their different sources and ultimately from the constitutional doctrine of the separation of powers. One kind — *quasi-legislative rules* — represents an authentic form of substantive lawmaking: Within its jurisdiction, the agency has

3

been delegated the Legislature's lawmaking power. . . . [¶] . . . [¶] . . . Unlike quasi-legislative rules, an agency's *interpretation* does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10-11 (*Yamaha*), italics added; see also *American Mining Congress v. Mine Safety & Health Administration* (D.C. Cir. 1993) 995 F.2d 1106, 1110 (*American Mining*) ["[T]he dividing line [between interpretive and quasi-legislative regulations] is the necessity for agency legislative action . . . . [A] rule supplying that action will be legislative . . . , and an interpretation that spells out the scope of an agency's or regulated entity's pre-existing duty . . . will be interpretive . . . ."].)**1**

    *Yamaha* also explained that quasi-legislative regulations are entitled to a high degree of deference, and that interpretive regulations are not. "Because agencies granted . . . substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, *the scope of its review is narrow*. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end. [¶] . . . [¶] . . . Because an interpretation is an agency's *legal*

---

**1** Although *American Mining*, *supra*, 995 F.2d 1106, construes the *federal* Administrative Procedure Act (5 U.S.C. § 551 et seq.), not the California APA, its discussion of the distinction between interpretive and quasi-legislative regulations has received wide recognition in the field of administrative law. (See, e.g., Breyer et al., Administrative Law and Regulatory Policy (4th ed. 1999) pp. 622-623; Davis & Pierce, Administrative Law Treatise (Supp. 2000) pp. 189-190; Mashaw et al., Administrative Law: The American Public Law System (5th ed. 2003) pp. 587-592.)

*opinion*, . . . rather than the exercise of a delegated legislative power to make law, *it commands a commensurably lesser degree of judicial deference*. [Citation.]" (*Yamaha*, *supra*, 19 Cal.4th at pp. 10-11, first and third set of italics added.)

*Yamaha* went on to say: "[E]ven formal interpretive rules do not command the same weight as quasi-legislative rules. Because ' "the ultimate resolution of . . . legal questions rests with the courts" ' [citation], *judges play a greater role when reviewing the persuasive value of interpretive rules than they do in determining the validity of quasi-legislative rules*." (*Yamaha*, *supra*, 19 Cal.4th at p. 13, italics added.)

This court later reiterated the same point in *Sara M. v. Superior Court* (2005) 36 Cal.4th 998: "Quasi-legislative rules are those that the agency promulgates as part of the lawmaking power the Legislature has delegated to it. Judicial review of these rules is *very limited*. [Citation.] Rules that *interpret* a statute receive *less judicial deference*." (*Id.* at p. 1012, first and third set of italics added.)

In summary, an agency's quasi-legislative regulations involve the discretionary creation of new law under a delegation of legislative power; court review is therefore limited to ensuring that the regulation is within the scope of the delegated power and not arbitrary, capricious, or lacking in a rational basis. (*Yamaha*, *supra*, 19 Cal.4th at p. 11.) By contrast, interpretive regulations explain what existing law means, which is ultimately a task for the courts to perform. Although courts give "great weight" to the administrative agency's view of the matter, they do not otherwise defer to the agency. (*Id.* at p. 12.)

### III

As noted (see pp. 1-2, *ante*), section 51(d), the statute involved here, defines "real property" for purposes of taxation as "that appraisal unit that persons in the marketplace commonly buy and sell as a unit, or that is normally valued

5

separately." The Board's Rule 474, adopted after the statute's enactment, states that the value of petroleum refinery property must generally be assessed as a single unit that includes both land and fixtures. The majority here asserts that Rule 474 is quasi-legislative because "[t]he precise content of [the] regulation[] is neither mandated nor prohibited" by section 51(d). (Maj. opn., *ante*, p. 11.) I disagree. In my view, Rule 474 interprets section 51(d), by applying it to a specific type of property.

Here, it is section 51(d), not Rule 474, that provides the governing substantive standard. With or without Board rules elucidating the application of section 51(d) to specific types of property, section 51(d) adequately defines "real property" and can be applied to various types of real property, including petroleum refinery properties, on a case-by-case basis. In other words, even without a rule on point, the Legislature's statutory definition of "real property" is, by itself, a fully enforceable legal standard.

This case is not one in which a statute identifies a complex problem (such as air pollution), sets forth a general goal (such as meeting state and federal air quality standards), and then broadly empowers an agency to study the problem and to adopt appropriate guidelines for specific industries that will achieve the Legislature's general goal. (See, e.g., Health & Saf. Code, § 40001, subd. (a); see also *American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 452-458.) In such a case, the statutory requirement is not self-executing, and the agency's regulation is necessary to establish which specific actions are prohibited and which are permitted. Not of that type, however, is section 51(d)'s definition of "real property" for purposes of taxation. Section 51(d) has no language through which the Legislature empowered the Board to make new law defining real property. Rather, section 51(d)'s definition of real

6

property is fully self-executing and enforceable irrespective of the Board's rules interpreting how it should be applied in specific situations.

The majority bases its conclusion that Rule 474 is quasi-legislative on the express grant of rulemaking authority set forth in Government Code section 15606. (Maj. opn., *ante*, pp. 10-11.) When the Legislature uses open-ended statutory language and expressly delegates to an administrative agency the power to interpret key words in the statute at issue, the agency's interpretation of those words is both quasi-legislative and interpretive. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 800 (*Ramirez*); see also *Yamaha*, *supra*, 19 Cal.4th at pp. 17-18 (conc. opn. of Mosk, J.).) It is quasi-legislative because the agency acts under an express delegation of lawmaking power; it is interpretive because the agency is giving meaning to an open-ended term in the statute. (*Ramirez*, at p. 800.) This court has not resolved what standard of review applies to such *hybrid* cases.

But for a regulation to be both quasi-legislative and interpretive, there must be some clear indication that the Legislature actually *intended* and *authorized* the agency to exercise legislative power in interpreting statutory terms. (See *Ramirez*, *supra*, 20 Cal.4th at pp. 799-800.) A mere generic grant of rulemaking authority, which can be found for nearly every California agency (see, e.g., Ed. Code, § 33031 [State Bd. of Education]; Pub. Resources Code, § 5003 [Dept. of Parks and Recreation]; Veh. Code, § 1651 [Dept. of Motor Vehicles]), is not enough to establish that the agency acts legislatively whenever it issues an interpretive regulation. Otherwise, virtually *every* interpretive regulation would be quasi-legislative, and the category of interpretive regulations would cease to have any practical meaning. That would be at odds with what this court said in *Yamaha*, *supra*, 19 Cal.4th at pages 10-11, and because of the deference owed to quasi-

7

legislative regulations, it would undermine the constitutional role of the courts in interpreting statutory law.

Hence, in those cases where this court has concluded that the regulation in question has both quasi-legislative and interpretive characteristics, a clear indication existed that the Legislature intended the agency to exercise legislative power when interpreting the statute that the agency is charged with enforcing. (See *Ramirez*, *supra*, 20 Cal.4th at pp. 799-800; *Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1013-1014.) That clear indication is lacking here. In such a situation, courts give the agency's interpretation of statutory language "great weight" but do not otherwise defer. (*Yamaha*, *supra*, 19 Cal.4th at p. 12.) Of course, to the extent an administrative regulation embodies *findings of fact*, courts must give such findings appropriate deference. (*Ibid.*; see *Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 314 (*Carmona*).)

This case is similar to *Carmona*, *supra*, 13 Cal.3d 303, a decision of this court. *Carmona* involved a regulation issued by the California Division of Industrial Welfare prohibiting the use of "[u]nsafe hand tools." (*Id.* at p. 307, italics omitted.) A group of farmworkers asked the agency to issue what was in effect a supplemental rule declaring the "short-handled hoe" to be an unsafe hand tool and banning its use throughout California. (*Ibid.*) Instead, the agency issued a decision that the short-handled hoe was *not* an unsafe tool within the meaning of the regulation at issue, reasoning that the short-handled hoe was not *inherently* unsafe. (*Id.* at p. 308.)

That *Carmona* involved the interpretation of a regulation, not a statute, is not significant. "The interpretation of a regulation, like the interpretation of a statue, is, of course, a question of law [citations], and . . . the ultimate resolution of such legal questions rests with the courts." (*Carmona*, *supra*, 13 Cal.3d at p. 310.) What is significant is that *Carmona*, like this case, involved the application of a

8

broad term ("unsafe hand tools") to a specific category (the "short-handled hoe"). *Carmona* concluded that the agency's decision (which permitted the statewide use of short-handled hoes and thus was, in effect, a regulation) was interpretive, not quasi-legislative. (*Ibid.*) As such, this court gave "great weight" to the agency's interpretation, but the court did not otherwise defer to the agency. (*Ibid.*) Instead, the court concluded that the agency had misconstrued the unsafe-hand-tool regulation, and that the proper interpretation of that regulation should consider whether a particular tool was unsafe *as used*, not merely whether it was *inherently* unsafe. (*Id.* at pp. 311-313.) *Carmona* remanded the matter to the agency for a new factual determination based on a correct understanding of the law. (*Id.* at p. 314.)

Like the Division of Industrial Welfare's application in *Carmona* of the unsafe-hand-tool regulation (*Carmona*, *supra*, 13 Cal.3d at p. 307) to a specific category of hand tool, the Board's application here of the statutory definition of "real property" (§ 51(d)) to a specific category of property is an *interpretation* of the statute. As such, it is entitled to "great weight," but not to any greater judicial deference. (*Yamaha*, *supra*, 19 Cal.4th at p. 12.)

The question remains whether the Board's construction of section 51(d) in Rule 474 was correct. In my view it was. As noted, section 51(d) defines "real property" as "that appraisal unit that persons in the marketplace commonly buy and sell as a unit, or that is normally valued separately." The Board took evidence and determined, as a factual matter, that the land and fixtures of petroleum refinery property are virtually always bought and sold in California as a single unit. Giving "great weight" (*Yamaha*, *supra*, 19 Cal.4th at p. 12) to the Board's interpretation of section 51(d), I agree with the Board that the relevant "marketplace" for purposes of applying section 51(d) is the *California* marketplace. In this context, the California marketplace makes the most sense, as

section 51(d) governs the taxation of California property.  I also agree with the Board that the word "commonly" in section 51(d) does not require a high volume of sales, but rather an examination of which type of sale is most typical among the few sales that occur.

From the Board's interpretations and factual findings, it follows that both the land and fixtures of petroleum refinery property constitute "real property" under section 51(d), and that is what the Board's Rule 474 says.  The rule states that "[t]he land . . . and fixtures . . . for a petroleum refining property are rebuttably presumed to constitute a single appraisal unit" (and therefore "real property" under section 51(d)).  (Rule 474.)  Because Rule 474 correctly interprets section 51(d), it is substantively valid.

Nevertheless, I agree with the majority that because the Board did not comply with the California APA in adopting Rule 474, the rule is procedurally invalid, and therefore the Court of Appeal's judgment invalidating Rule 474 is correct.


KENNARD, J.


10

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Western States Petroleum Association v. Board of Equalization
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 202 Cal.App.4th 1092
**Rehearing Granted**

_____

**Opinion No.** S200475
**Date Filed:** August 5, 2013
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert L. Hess

_____

**Counsel:**

Kamala D. Harris, Attorney General, David S. Chaney, Chief Assistant Attorney General, Alicia Fowler, Acting Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Felix E. Leatherwood, W. Dean Freeman and Brian D. Wesley, Deputy Attorneys General, for Defendant and Appellant.

Letwak & Bennett and Stephen H. Bennett as Amici Curiae on behalf of Defendant and Appellant.

John F. Krattli, County Counsel (Los Angeles) and Albert Ramseyer, Principal Deputy County Counsel, for Los Angeles County Office of the Assessor as Amicus Curiae on behalf of Defendant and Appellant.

Sharon L. Anderson, County Counsel (Contra Costa), Rebecca Hooley, Deputy County Counsel; Greenan, Peffer, Sallander & Lally, Kevin D. Lally, John P. Makin and Robin L. Thornton for Contra Costa County as Amicus Curiae on behalf of Defendant and Appellant.

Cahill Davis & O'Neall, C. Stephen Davis, Cris K. O'Neall and Andrew W. Bodeau for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Brian D. Wesley
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-5754

C. Stephen Davis
Cahill Davis & O'Neall
550 South Hope Street, Suite 1650
Los Angeles, CA  90071
(213) 622-0600