Filed 3/1/24

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TRC OPERATING COMPANY et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>DAVID SHABAZIAN, as Director, etc., et al.,<br><br>Defendants and Appellants. | F085832<br><br>(Super. Ct. No. BCV-21-100386)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Kern County.  J. Eric Bradshaw, Judge.

Rob Bonta, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Andrew M. Vogel, Wyatt E. Sloan-Tribe, and Matthew T. Struhar, Deputy Attorneys General, for Defendants and Appellants.

Pledger Law and Jean M. Pledger for Plaintiffs and Respondents.

-ooOoo-

California Geologic Energy Management Division (CalGEM) "is a division of the Department of Conservation and is led by the 'State Oil and Gas Supervisor [(supervisor)].' " (*Chevron U.S.A. Inc. v. County of Monterey* (2023) 15 Cal.5th 135, 140, fn. 3 (*Chevron*).)  CalGEM is "tasked with overseeing the state's drilling, operation, maintenance, and plugging and abandonment of oil and gas wells." (*Id.* at p. 140.)

**SEE DISSENTING OPINION**

Our state's "oil and gas operations are governed by Division 3 of the Public Resources Code (§ 3000 et seq.) and its implementing regulations (Cal. Code Regs., tit. 14, § 1712 et seq.)." (*Chevron, supra,* 15 Cal.5th at p. 143.) Public Resources Code[1] section 3106 "directs the supervisor to administer the state's regulations in a way that serves the dual purpose of ensuring the state has adequate oil and gas resources, while protecting the environment." (*Chevron,* at p. 144.)

Decades ago, the United States Environmental Protection Agency (EPA) authorized CalGEM,[2] under the federal Safe Drinking Water Act, to protect California's drinking water from damage caused by oil operations (42 U.S.C. § 300f et seq.; 40 C.F.R. § 147.250). In response to a 2011 EPA audit finding CalGEM deficient in protecting the state's drinking water, CalGEM recently promulgated and adopted new regulations. A few of those new regulations are at issue in this case.

The challenged regulations essentially require oil operators to cease operations when a "surface expression"[3] exists or there is reason to believe a specific operation is causing a surface expression. The regulations further demand operations to remain dormant until CalGEM, in writing, authorizes operations to resume.

TRC,[4] an oil operator, became subject to a regulatory notice to cease operations. After complying with the notice but then never receiving authorization to resume, TRC sought an administrative appeal. (See § 3225, subd. (d) ["When the supervisor or a

---

[1] Undesignated statutory references are to the Public Resources Code.

[2] At the time, "CalGEM was known as the Division of Oil, Gas, and Geothermal Resources, DOGGR." (*Chevron, supra,* 15 Cal.5th at p. 140, fn. 3.)

[3] A surface expression is defined as "a flow, movement, or release from the subsurface to the surface of fluid or other material such as oil, water, steam, gas, formation solids, formation debris, material, or any combination thereof, that is outside of a wellbore and that appears to be caused by injection operations." (Cal. Code Regs., tit. 14, § 1720.1, subd. (n).)

[4] TRC Operating Company, Inc. and TRC Cypress Group, LLC.

2.

district deputy issues a written order concerning an operation, an appeal may be made from the order"].)  That appeal went unheard because an "Appeals Officer" within the Department of Conservation determined CalGEM's regulatory notice was not an administratively appealable order under section 3225.

TRC subsequently sought judicial review and challenged the underlying regulations via Government Code section 11350.  Alternatively, it argued CalGEM's actions relative to TRC were arbitrary and capricious.  The trial court agreed the regulations were invalid, granted declaratory relief, and issued a writ of mandate but did not reach TRC's alternative argument.

We conclude the regulations were valid and vacate the trial court's writ.  We will remand the matter to the trial court to consider in the first instance whether CalGEM's actions in this case were nonetheless arbitrary or capricious.[5]

## BACKGROUND

CalGEM is responsible for protecting health and safety while simultaneously promoting oil and gas operations.  (§ 3106.)  Through the EPA, it is also charged with protecting drinking water from leaks associated with oil operations.

In 2011, an EPA audit found CalGEM deficient in its role to protect drinking water.   In the same year, an oil worker was killed by a surface expression.  CalGEM responded with a "third-party" review for "compliance" with the EPA's expectations.

The review found, among other things, CalGEM lacked resources and staff "to initiate adequate numbers of compliance/enforcement actions."  Separately, CalGEM recognized its "current regulations [did] not specifically address or prohibit surface expressions," "although … a surface expression [was] indicative of … rates and pressures above safe levels and" operations not remaining confined to their approved zone.

---

[5] CalGEM also requested us to judicially notice a document already contained in the record.  Because it is already in the record, we deny the request in the disposition.

3.

A few years later, CalGEM promulgated new regulations. The regulations at issue in this case are California Code of Regulations, title 14, section 1724.11, subdivisions (d), (e), and (g), and section 1724.13, subdivisions (a)(9) and (b).

*New Regulations*

CalGEM's overarching goals with its new regulations were to "modernize, clarify, and augment … regulatory standards," and "increase[d] transparency" with respect to oil operators. CalGEM believed these goals would "aid … in implementing its statutory mandate … to prevent damage to life, health, property, and natural resources."

In an Initial Statement of Reasons (ISOR), CalGEM promulgated California Code of Regulations, title 14, section 1724.11, subdivision (d), which "require[d] automatic cessation … at wells … located within a 300-foot radius of a surface expression." The radius would increase over time if "the surface expression continue[d] to flow …." Similarly, California Code of Regulations, title 14, section 1724.11, subdivision (e) "preserve[d]" CalGEM's "discretionary authority to direct … operations to cease at a well, regardless of its distance from [a] surface expression, if [it found] reason to believe the well [was] causing or contributing to [a] surface expression."

CalGEM believed these regulations were "necessary to standardize the minimum response actions in the event of a surface expression" because "in many cases, the closer the … well [was] to a surface expression, the more likely that well [was] causing or contributing to its existence." These regulations were also "necessary to increase the consequences for causing surface expressions," "incentiviz[ing] safer, more prudent" operations by "discouraging at the outset oilfield practices that can lead to surface expressions."

California Code of Regulations, title 14, section 1724.11, subdivision (g) required CalGEM to approve operations prior to restarting them. This regulation was "necessary to facilitate effective … oversight and enforcement of the proposed requirements." Elsewhere, CalGEM explained the regulations codified its policy against surface

4.

expressions, and "[c]odification" would "promote transparency" which was likewise "necessary [to] effectively implement[]" its statutory mandate to protect health and safety.

"As a whole," California Code of Regulations, title 14, section 1724.11 would "improve [CalGEM's] effective oversight of surface containment measures by ensuring that operators' use of surface expression containment measures [are] properly accounted for, and that containment measures meet minimum safety-related standards." The section was "necessary to implement" the statutory mandate to protect health and safety.

California Code of Regulations, title 14, section 1724.13 "specif[ied] a list of circumstances that require[d] operators to notify [CalGEM] and cease" operations "until" authorized to resume. CalGEM stated "[t]hese proposed regulations [would] strengthen [its] oversight … and help reduce threats to life, health, property, and natural resources by halting" operations "that are not compliant with legal requirements." It also noted, "[u]nder existing regulations, operators who violate those requirements sometimes continue operations until [CalGEM] issues a remedial order. The proposed [regulation] would delineate clear, immediate, and consequential obligations for operators to cease [when] not in compliance with the specified requirements. Operators who continue … in violation of the proposed [regulation] would be separately liable for violating [the proposed regulation], in addition to the underlying violation … that triggered the obligation to cease …." This, CalGEM asserted, was necessary to implement the statutory mandate to protect health and safety. Overall, the proposed regulations "provide[d] adequate disincentive for noncompliance."

After soliciting public comment on the proposed regulations, CalGEM issued a Final Statement of Reasons (FSOR). The FSOR is largely identical to the ISOR, with the noted exception CalGEM, in response to public comment, reduced the initial radius within which to cease operations near a surface expression to 150 feet.

*Notice*

After the new regulations were formally adopted, CalGEM issued a notice to TRC directing it to "[i]mmediately cease" its operations near a longstanding surface expression. The notice made clear TRC's operation was "prohibited until … written approval" it could resume.

TRC complied while specifically inquiring into "the approved methodology by which an operator may appeal such decisions." Finding its efforts to appeal thwarted, TRC filed suit in superior court.

*Trial Court Proceedings*

In court, TRC argued CalGEM's regulations were "invalid on the grounds that substantial evidence [did] not support [the] determination that such regulations" were "necessary …." It also urged they were "in conflict with statutes covering the same area of law." Alternatively, TRC suggested CalGEM's specific actions in this case were arbitrary and capricious.

*Ruling*

The trial court ruled the new regulations were invalid because they conflicted with section 3225 which governs CalGEM's authority to issue statutory orders. The court reasoned an oil operator issued an order pursuant to section 3225 had the right to an administrative appeal, but the regulatory-violation notices bypassed the appeal. It also found there was no substantial evidence the regulations were reasonably necessary because the statutes already allowed CalGEM to order operations to cease.

## DISCUSSION

CalGEM's appeal presents two questions for review. One, are the regulations at issue valid? Two, did CalGEM essentially abuse its discretion in issuing the notice to TRC in this case?

We conclude the regulations are valid because they are consistent with the overall statutory scheme and are supported by substantial evidence. However, we will remand to

the trial court for further proceedings, including to consider whether CalGEM's specific actions relative to TRC were nonetheless inappropriate.

## I.  The Regulations Are Valid

TRC now argues the regulations conflict with the Public Resources Code and are not otherwise supported by substantial evidence they are reasonably necessary.  CalGEM, of course, contends its regulations are valid.  As explained below, CalGEM has the better argument.

### A.  Reviewing Standard

"The principles applicable to determining the validity of regulations promulgated by a state agency are well settled."  (*In re Gadlin* (2020) 10 Cal.5th 915, 925 (*Gadlin*).)  "In evaluating the validity of a regulation under these principles, we first ask whether the regulation is ' "consistent and not in conflict with" ' the provision that authorizes it.  [Citation.]  We then inquire whether the regulation is reasonably necessary to effectuate the purpose of the authorizing law."  (*Id.* at p. 926.)  "Our task as a reviewing court ' " 'is to decide whether the [agency] reasonably interpreted [its] mandate.' " ' "  (*Ibid.*)

"We presume the validity of a regulation promulgated by a state agency.  [Citation.]  The burden lies with the party challenging the regulation to show its invalidity.  [Citation.]  'Such a limited scope of review constitutes no judicial interference with the administrative discretion in that aspect of the rulemaking function which requires a high degree of technical skill and expertise.' "  (*Gadlin, supra,* 10 Cal.5th at p. 926.)  " ' "Our function is to inquire into the legality of the regulations, not their wisdom." ' [Citations.]  Still, ' " 'final responsibility for the interpretation of the law rests with the courts.' [Citations.]  Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations." ' "  (*Ibid.*)

"When a regulation is challenged on the ground that it is not 'reasonably necessary to effectuate the purpose of the statute,' our inquiry is confined to whether the rule is

7.

arbitrary, capricious, or without rational basis [citation] and whether substantial evidence supports the agency's determination that the rule is reasonably necessary …." (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415 (*Western States*).) "At the same time, when an implementing regulation is challenged on the ground that it is 'in conflict with the statute' [citation] or does not 'lay within the lawmaking authority delegated by the Legislature' [citation], the issue of statutory construction is a question of law on which a court exercises independent judgment. [Citation.] In determining whether an agency has incorrectly interpreted the statute it purports to implement, a court gives weight to the agency's construction." (*Id.* at p. 415.)

**B. Analysis**

As noted, TRC argues the regulations in this case are invalid because they conflict with the Public Resources Code and, alternatively, they are not supported by substantial evidence they are reasonably necessary. We address each argument in turn.

**i. The Regulations Are Consistent With the Public Resources Code**

Section 3013 requires us to "liberally construe[]" the statutes governing oil and gas regulation in California. It also explicitly states the Director of Conservation and the State Oil and Gas Supervisor "have all powers, including the authority to adopt rules and regulations, which may be necessary to carry out the purposes of this division," i.e., sections 3000 through 3865.

Section 3106 demands "supervis[ing] the drilling, operation, maintenance, and abandonment of wells … so as to prevent, as far as possible, damage to life, health, property, and natural resources[.]" Section 3236.5, subdivision (a) provides for "civil penalt[ies]" "imposed by an order of the supervisor pursuant to Section 3225" against any "person who violates … a regulation" adopted pursuant to sections 3000 through 3473.

It is clear the Legislature envisioned a three-step framework permitting CalGEM to impose penalties for regulatory violations. First, the supervisor would adopt regulations to prevent damage to life, health, and property. (§§ 3013 & 3106.) Second,

8.

the supervisor *could* enforce a regulatory violation via an order. (§ 3236.5.) Third, *if* imposed, that order would issue pursuant to section 3225. Section 3225, in turn, requires an enforcement order to "provide a clear and concise recitation of the acts or omissions with which the operator is charged" and to "provide references to the [statutes] and the *regulations* that support" the action. (§ 3225, subd. (a), emphasis added.)

The regulations at issue in this case are compatible, and are not in conflict with this framework. There is no doubt CalGEM is permitted to adopt regulations to protect health and safety. There is no doubt regulatory violations are enforceable by order. There is no doubt orders enforcing regulatory violations are pursued through section 3225.

Based on this construction, CalGEM suggests a regulatory notice issued to an operator, including a notice to cease, is not appealable until it is enforced. Admittedly, as TRC points out, this would require an operator to choose between complying with a notice or to essentially ignore it, force CalGEM to issue a statutory order (§ 3225), and risk additional penalties to invoke a statutory right to appeal.

We lend credence to CalGEM's interpretation because it comports with our interpretation. (*Western States, supra,* 57 Cal.4th at p. 416.) Although arguably inefficient, the statutes' plain language establishes the Legislature intended CalGEM to adopt regulations, assess penalties against those who violate regulations, and to assess those penalties pursuant to section 3225. In other words, *only when* those penalties are *enforced* do operators have a statutory right to an administrative appeal. For better or worse, this is exactly what the Legislature envisioned when enacting these statutes—a regulatory violation necessarily must precede its enforcement. CalGEM's adopted regulations in this case do not conflict with this framework.

Contrary to TRC's argument and the trial court's position, CalGEM's regulations neither bypass an appeal nor deny due process. Because regulatory violations are only enforceable pursuant to section 3225, they remain appealable when *enforced*. (§ 3225,

subd. (d) ["When the supervisor or a district deputy issues a written order concerning an operation, an appeal may be made from the order"].)

Similarly, TRC points out section 3225 demands "a detailed explanation of the steps that the operator shall take before the supervisor will permit the operations to resume." (§ 3225, subd. (b).) Because CalGEM's regulatory notices to cease do not also require the same "detailed explanation," TRC contends the new regulations conflict with this statute. We disagree.

The detailed explanation required by section 3225 applies only to orders issued pursuant to section 3270.3, which deals with "minimum facility maintenance standards …." (§ 3270, subd. (a) [CalGEM "shall, by regulation, prescribe minimum facility maintenance standards"]; § 3270.3 ["the supervisor, upon his or her determination or that of the district deputy that a production facility is being operated in violation of the standards prescribed in subdivision (a) of Section 3270, may issue a cease-and-desist order to a production facility operator requiring the operator to cease operation"].) It is simply not applicable to all statutory orders.[6]

Finally, TRC, and the trial court, note CalGEM is already empowered to issue emergency orders. Under section 3226, subdivision (b), "if the supervisor determines that an emergency exists, the supervisor may order or undertake the actions the supervisor deems necessary to protect life, health, property, or natural resources." The regulations at issue here also do not conflict with this statute because they permit CalGEM to protect health and safety by ordering oil operations to cease even if a surface expression is not an emergency.[7]

---

[6] "An order requiring an operator to cease and desist operations pursuant to Section 3270.3 shall specify the operations that the operator is required to cease and desist and shall provide a detailed explanation of the steps that the operator shall take before the supervisor will permit the operations to resume." (§ 3225, subd. (b).)

[7] It does not appear "emergency" is defined by statute. The absence of a definition demonstrates CalGEM's desire to promote transparency by adopting clear, standardized

In sum, we reject TRC's argument the regulations in this case conflict with the Public Resources Code. TRC has failed to discharge its burden to prove the challenged regulations conflict with their authorizing statute. (*Gadlin, supra,* 10 Cal.5th at p. 925.) Most importantly, CalGEM's regulations are consistent with its legislative mandate to protect health and safety. Reading a right to appeal a regulatory-violation notice into section 3225 would require us to rewrite the law.

We note, however, under the regulations at issue in this case, CalGEM may only issue a regulatory notice to cease if an operation is within a certain distance to a surface expression, or CalGEM has reason to believe the operation is causing or contributing to a surface expression. (See Cal. Code Regs., tit. 14, § 1724.11, subds. (d), (e), & (g).) CalGEM has no authority, as pertinent, to direct an operation to cease absent a surface expression.

Accordingly, an operator choosing to defend itself against one these regulatory violations may always dispute that it caused or contributed to a surface expression.[8] Whether an operator actually causes or contributes to the surface expression is relevant and material to whether it is liable for violating a regulation.

### ii. The Regulations Are Supported By Substantial Evidence

The remaining question is whether the regulations are supported by substantial evidence they are reasonably necessary. (Gov. Code, § 11350, subd. (b)(1); see *Western*

---

responses to surface expressions, rather than regulating on a case-by-case basis. Indeed, as the regulations recognize, not all surface expressions are emergencies. (E.g., Cal. Code Regs., tit. 14, § 1724.12, subd. (b) ["low-energy seep" is not subject to certain regulations].)

[8] At oral argument, counsel for TRC suggested it was impossible to defend against a regulatory-violation notice because an operator, by not complying, necessarily violates the regulation to cease upon written direction from CalGEM. We disagree because, as stated, the cause underlying a surface expression is an indispensable element for any statutory order pursuant to these regulations. CalGEM's actions may otherwise, if appropriate, be challenged by administrative mandamus.

*States, supra,* 57 Cal.4th at p. 415.) We conclude that they are supported by substantial evidence.

"When inquiring into whether a regulation is arbitrary, capricious, or lacking in evidentiary support, the " ' " ' " 'court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' " ' " ' " (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 460 (*American Coatings*.) "It is worth noting that 'the question whether agency action is "entirely lacking in evidentiary support" is not the same as a substantial evidence test.' " (*Id.* at p. 461.)

"[A] court may find that 'the Legislature has *delegated* the task of interpreting or elaborating on a statute to an administrative agency,' for example, when the Legislature 'employs open-ended statutory language that an agency is authorized to apply or "when an issue of interpretation is heavily freighted with policy choices which the agency is empowered to make." ' " (*American Coatings, supra,* 54 Cal.4th at p. 461.) This is such a case.

The Legislature mandated CalGEM to protect health and safety (§ 3106), and authorized it to adopt regulations (§ 3013). The general language used in these statutes evidences delegation. Delegation demands considerable deference. (*American Coatings, supra,* 54 Cal.4th at p. 461 ["an agency [exercising statutorily delegated policymaking discretion] adopts generally applicable rules through an administrative process in which 'the demarcation between facts, reasoning, policy and discretion is quite vague.' "].)

" ' "Our function is to inquire into the legality of the regulations, not their wisdom." ' " (*Gadlin, supra,* 10 Cal.5th at p. 926.) The regulations in this case are not arbitrary, capricious, or irrational. (*Western States, supra,* 57 Cal.4th at p. 415.)

Both in the ISOR and FSOR, CalGEM made clear the reasons it believed the regulations were reasonably necessary. (See Gov. Code, §§ 11346.2 & 11346.9.)

CalGEM's primary reason was that the regulations were necessary to protect health and safety as mandated by section 3106.

More specifically, CalGEM noted operators in the past ignored regulatory violations and the new regulations wrought additional penalties that were necessary to both ensure operator compliance and to standardize industry response to surface expressions. These regulations, CalGEM believed, "provide[d] adequate disincentive for noncompliance." We are not in a position to disagree: noncompliance resulting in surface expressions rationally endangers life.

For example, CalGEM explained surface expressions are "indicative of [operations] being performed at rates and pressures above safe levels," or that operations are "not confined to the approved … zone." The explanation is persuasive because it involves technical expertise to which we typically defer. (*Gadlin, supra,* 10 Cal.5th at p. 926.)

Similarly, CalGEM believed its distance-based regulation, i.e., to cease operations within 150 feet of a surface expression, was important because "the closer the … well [was] to a surface expression, the more likely that well [was] causing or contributing to its existence." We agree that makes sense—and it goes without stating that surface expressions are dangerous to life, having already claimed one person's life, let alone logically endangering both drinking water and damaging oil resources. CalGEM's regulations to cease operations upon notice to operators are reasonably necessary to implement the statutory mandate to protect health and safety.

Because substantial evidence supports CalGEM's determination these regulations are reasonably necessary to protect health and safety, and there is a rational connection between the regulations and that goal, our inquiry is at an end. (*American Coatings, supra,* 54 Cal.4th at p. 460; *Western States, supra,* 57 Cal.4th at p. 415.) We cannot find CalGEM unreasonably interpreted its mandate to protect health and safety. (*Gadlin, supra,* 10 Cal.5th at p. 926 ["Our task as a reviewing court ' " 'is to decide whether the

[agency] reasonably interpreted [its] mandate.' " ' "].)  TRC has not proven otherwise and we reject its argument.

## II.  Remand For Further Proceedings

Because the trial court determined CalGEM's regulations at issue in this case were invalid, it did not decide whether CalGEM's actions relative to TRC were nonetheless arbitrary or capricious.  As we now determine the regulations were valid, the trial court on remand should in the first instance determine whether CalGEM's actions were arbitrary or capricious.[9]

### DISPOSITION

Both the trial court's declaratory relief grant and issued writ are vacated.  On remand, the trial court is directed to conduct further proceedings consistent with this opinion.  Each party to bear its costs.  CalGEM's July 7, 2023, request for judicial notice is denied.

 

 

SNAUFFER, J.

I CONCUR:

DE SANTOS, J.

---

[9] The Attorney General, representing CalGEM, endorses this approach.  TRC, in its complaint, had also alleged an inverse condemnation claim.  The status of that claim is unclear.

14.

POOCHIGIAN, Acting P. J., dissenting.

By statute, the Legislature has provided that a government agency can order well operations to cease, and that well operators can appeal such an order. By regulation, the same government agency currently claims the power, in certain cases, to issue directives for well operations to cease that are *not* appealable. The incompatibility between the statutory scheme and the agency's regulatory position is plain, and the statutory right to appeal prevails. The trial court's judgment was correct and should be affirmed.

### *The Statutory Scheme*

By statute, California Geologic Energy Management Division (CalGEM) has broad authority to adopt rules and regulations concerning oil and gas extraction. (Pub. Resources Code, §§ 3013, 3106.)[1] However, their regulations – like all administrative regulations – must not conflict with state statutes. (See *City of San Jose v. Department of Health Services* (1998) 66 Cal.App.4th 35, 41.)

Chapter 1 of division 3 of the Public Resources Code grants CalGEM the statutory authority to order an operator to cease its operations. (§§ 3224; 3270.3; 3225, subd. (b); 3226, subd. (b); 3270.3.) All such orders may be appealed by the operator. (§ 3350.) Upon appeal, operators are afforded either a formal hearing (§ 3351, subd. (a)) or a hearing before the director (*id.*, subd. (c)), even in the case of emergency orders.[2] (*id.*, subd. (d).) Hearings must be conducted within specified timeframes. (§ 3352, subd. (a).) Operators have the right to present oral and documentary evidence at the hearing. (*id.*, subd. (c) [hearings before director]; Gov. Code, § 11513, subd. (b) [formal hearings].) The outcome of the hearing is itself subject to judicial review. (§ 3354.)

---

[1] All further undesignated statutory references are to the Public Resources Code unless otherwise stated.

[2] If an emergency order is set aside on appeal, CalGEM must reimburse the operator for costs. (§ 3350, subd. (b)(2).)

### The Regulatory Scheme

CalGEM has issued regulations granting itself the power to "direct injection to cease at any injection well, regardless of its distance from a surface expression, if the Division finds reason to believe that the injection well is causing or contributing to a surface expression." (Cal. Code Regs., tit. 14, § 1724.11, subd. (e).) When CalGEM has issued a directive pursuant to this regulation, the well may not resume injection (i.e., business operations) until written approval is issued. (*Id.*, § 1724.11, subd. (g).)

Here, CalGEM transmitted a communication to TRC stating "TRC is required to perform the following actions: [¶] 1. Immediately cease steam injection operations within a 600 ft radius around the surface expression…." The directive further emphasized that injection could not be restarted until CalGEM was "satisfied" that the cause of the surface expression had been remediated. CalGEM contends this directive was not appealable, in that it does not trigger the due process procedures of article 6, chapter 1, division 3 of the Public Resources Code.

### The Statutory and Regulatory Scheme Are in Conflict

There is a straightforward conflict between the statutory and regulatory schemes described above. The statutes say CalGEM can order operations to stop, but that such an order is appealable. In contrast, CalGEM argues they can order operations to stop (in the case of surface expressions), but that such an order is not appealable.

CalGEM tries to avoid this obvious conflict by clearly mischaracterizing its regulation. It argues that the regulation does not provide for an "*order* requiring suspension of injection" but rather a *notice* that continued injection *would* violate the law. In fact, the opposite is true. The regulation says that CalGEM can "direct injection to cease." (Cal. Code Regs., tit. 14, § 1724.11, subd. (e).) As a matter of plain language, there is no difference between a "directive" requiring injection to "cease" and an "order" requiring "suspension" of injection.

CalGEM directives under California Code of Regulations section 1724.11, subdivision (e) are not just "orders" as a matter of semantics, but in substance and effect as well. Complying with a CalGEM directive is not optional, as injection operations must cease until written approval to resume is issued. (Cal. Code Regs., tit. 14, § 1724.11, subd. (g).) In other words, a CalGEM directive to cease injection has a direct and immediate real-world effect and is not merely informative in nature. It is, in word and deed, an order requiring suspension of injection.

In its reply brief, CalGEM tries to suggest that its directives cannot be "violated," and that only the underlying regulations can be "violated." This contention is unpersuasive. California Code of Regulations section 1724.11, subdivision (f) requires compliance with directives issued under subdivision (e), by providing: "Wells that have ceased injecting pursuant to subdivisions (d) *or (e)* may not resume injection until … [written authorization to resume is issued]." In situations where the well has ceased injecting pursuant to subdivision (e), it is the issuance of CalGEM's directive that has made it illegal to conduct injection operations under subdivision (f). In other words, it is the disobeying of the directive that constitutes a regulatory violation. Consequently, CalGEM is quite wrong to say that subsequent penalties would not "flow" from CalGEM's directive to cease injection.

### *Conclusion*

A system that provides for temporary measures to address immediate health and safety concerns makes sense. But the statutory scheme already provides for that without CalGEM's nonappealable "notice" theory. CalGEM can issue emergency orders, with which operators must immediately comply. (See § 3350, subd. (b)(2).) But even with emergency orders, operators have the opportunity to seek review (*id*., subd. (b)(4)), and they are compensated for costs incurred by improper orders (*id*., subd. (b)(2)). However, under the scheme devised by CalGEM, the government can threaten substantial legal and financial consequences without due process as envisioned by statute and without any

3.

binding timeline for resolution.  Consequently, the agency can hold up operations indefinitely – leaving the operator with the choice of abandoning operations or violating the government agency's clear directive to "[i]mmediately cease steam injection operations."  Adhering to the statutory scheme alleviates all of these problems while leaving CalGEM with the ability to protect health, safety and the environment.

Because CalGEM's assumption of authority to issue nonappealable orders to cease operations in certain cases is contrary to the statutory scheme, the trial court was correct to invalidate the regulation, and I respectfully dissent from the majority's contrary conclusion.


POOCHIGIAN, Acting P. J.

4.